SCHNADER HARRISON SEGAL & LEWIS LLP
By:  Lisa J. Rodriguez
Woodland Falls Corporate Park           JURY TRIAL DEMANDED
220 Lake Drive East, Suite 200
Cherry Hill, NJ  08002
(856) 482-5741
ljrodriguez@schnader.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
_____

| | |
|---|---|
| CONSOLIDATED RAIL CORPORATION<br>1717 Arch Street, 32nd Floor<br>Philadelphia, PA  19103<br><br>      Plaintiff<br><br>    v.<br><br>ASPEN SPECIALTY INSURANCE COMPANY<br>175 Capital Boulevard<br>Suite 300<br>Rocky Hill, CT  06067<br><br>and<br><br>HUDSON SPECIALTY INSURANCE COMPANY<br>100 William Street, 5th Floor<br>New York, NY  10038<br><br>and<br><br>LANDMARK AMERICAN INSURANCE COMPANY<br>945 East Paces Ferry Road<br>Suite 1800<br>Atlanta, GA  30326<br><br>      Defendants. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

_____

## COMPLAINT

Plaintiff Consolidated Rail Corporation ("Conrail") alleges for its Complaint as follows:

1. This is an action for breach of contract under property insurance policies issued to Conrail by Defendants Aspen Specialty Insurance Company ("Aspen"), Hudson Specialty Insurance Company ("Hudson") and Landmark American Insurance Company ("Landmark") (collectively, the "Insurers") with respect to property damage and other loss sustained by Conrail as a result of a train derailment on November 30, 2012 that occurred on a bridge owned by Conrail in Paulsboro, New Jersey.

## PARTIES

2. Conrail is a corporation organized under the laws of Pennsylvania, with its principal place of business in Philadelphia, Pennsylvania. Conrail was created on April 1, 1976, pursuant to federal statute, 45 U.S.C. §§ 741 *et seq.*, to operate as a freight railroad in the northeastern United States.

3. Defendant Aspen is an insurance company incorporated in North Dakota, with its principal place of business in Rocky Hill, Connecticut. Aspen is engaged in the business of insurance and sold Policy No. PXAAOKP12 (described in greater detail below) to Conrail.

4. Defendant Hudson is an insurance company incorporated in New York, with its principal place of business in New York, New York. Hudson is engaged in the business of insurance and sold Policy No. HCS100055 (described in greater detail below) to Conrail.

5. Defendant Landmark is an insurance company incorporated in New Hampshire, with its principal place of business in Atlanta, Georgia. Landmark is engaged in the business of insurance and sold Policy No. LHD376959 (described in greater detail below) to Conrail.

6. All of the defendant Insurers are licensed in the State of New Jersey and conduct or have conducted business in that state.

## JURISDICTION AND VENUE

7. Jurisdiction in this action is predicated on 28 U.S.C. § 1332 inasmuch as diversity of citizenship exists between Plaintiff and Defendants and the amount in controversy exceeds the sum of $75,000 exclusive of interests and costs.  The Court has personal jurisdiction over the defendant Insurers pursuant to New Jersey Court Rule 4:4-4 and *Gendler & Co. v. Telecom Equipment Corp.*, 508 A.2d 1127 (N.J. 1986), because they conduct or have conducted insurance business in New Jersey and, with respect to Conrail, insured risks located within New Jersey.

8. Venue in this judicial district is proper under 28 U.S.C. § 1391.  Among other bases, (i) the events giving rise to Conrail's claim occurred in this district, including but not limited to the property loss for which insurance coverage is sought in this action; (ii) a substantial part of the property risk insured under the insurance contracts that are the subject of this action is situated in this district; and (iii) Defendants are otherwise subject to personal jurisdiction in this district.

## THE INSURANCE POLICIES AT ISSUE

9. The Insurers each sold "ALL RISKS" insurance policies to Conrail insuring against property damage occurring during the period June 1, 2012 to June 1, 2013 (the "Policies").  The Policies collectively provide limits totaling $30 million that attach excess of the primary policy sold by Lexington Insurance Company ("Lexington"), which provides $10 million of coverage excess of $5 million self-insured retention.

10. More specifically, the Policies are described as follows:

| Insurer | Policy Period | Policy Number | Coverage |
|---|---|---|---|
| Aspen | 6/1/2012 to 6/1/2013 | PXAAOKP12 | $6 million part of $30 million excess of $15 million |
| Hudson | 6/1/2012 to 6/1/2013 | HCS100055 | $18 million part of $30 million excess of $15 million |
| Landmark | 6/1/2012 to 6/1/2013 | LHD376959 | $6 million part of $30 million excess of $15 million |

The attached Exhibit 1 is a true and correct copy of Aspen Policy PXAAOKP12; the attached Exhibit 2 is a true and correct copy of Hudson Policy HCS100055; and the attached Exhibit 3 is a true and correct copy of Landmark Policy LHD376959.

11. Each of the Insurers' Policies "insures against ALL RISKS of direct physical loss, damage or expenses to covered property, including claim adjustment and subrogation expenses, except as may be further extended, limited, or defined elsewhere" in the Policies.

12. The Policies also "cover consequential expenses or losses resulting from the enforcement of laws or ordinances which do not permit restoration of structures to their condition prior to the damage caused by a peril insured against." The Policies also provide that "[i]n the event of loss or damage under this policy that results in the enforcement of any law or ordinance regulating the construction or repair of damaged facilities, including the demolition of the undamaged portions of facilities," the Insurers shall be liable for "the increased cost of repair or reconstruction of the damaged and undamaged facility on same or another site and limited to the minimum requirements of such law or ordinance regulating the repair or reconstruction of the damaged property on the same site."

4

13. Additionally, the Policies cover "Contingent liability from operation of law governing the demolition, repair or replacement of insured property," which is defined to include:

> "consequential expenses or losses resulting from the enforcement of laws or ordinances which do not permit restoration of structures to their condition prior to the damage caused by a peril insured against. These expenses shall include the loss of value of the undamaged portion of the structure, cost of demolition of the undamaged portion of the structure, and increased expense to replace the structure with one conforming to laws or ordinances or to repair the damaged structure so that it meets current building laws or ordinances."

14. The Policies further contemplate insurance for consequential losses arising out of damage to insured property. Specifically, the Policies insure:

> "The necessary extra expenses to maintain operations as near to normal as practical, including detour expenses and expediting expenses, resulting from partial or complete suspension of business conducted by the Insured caused by loss, damage, or destruction to … all property except finished stock as described in Section 2(A)."

15. The Policies also cover "Expense to Reduce Loss," which includes "expenses (including expediting expenses) … incurred for the purpose of reducing any loss, even though such expense may exceed the amount … by which the loss is thereby reduced."

16. The Insurers' Policies each contain a provision titled, "Loss Adjusters," which states: "In the event of Loss or damage hereunder, James D. Ratcliff of Ratcliff Property Adjusters, shall have the authority to assign loss adjusters as required."

17. Conrail purchased the Policies to provide, among other things, peace of mind and prompt payment in the event of a calamity.

## THE PAULSBORO DERAILMENT AND RESULTING DAMAGE

18. This coverage dispute arises out of the November 30, 2012 derailment of a Conrail train while crossing a bridge across Mantua Creek in Paulsboro, New Jersey.

5

Specifically, the train derailed on a swing bridge located at river mile 1.3 on Mantua Creek in Paulsboro, New Jersey (the "Swing Bridge") shortly after 7 a.m. (the "Derailment"). As noted by the Insurers' engineer, the Swing Bridge "is an unusual design in that it swings like a door" to accommodate marine traffic.

19. At the time of the Derailment, the Swing Bridge was over a century old. Conrail owned and operated the Swing Bridge. The Derailment left the movable element of the Swing Bridge heavily damaged and inoperable. The Unified Incident Command for the Derailment (led by the United States Coast Guard) directed Conrail to temporarily repair the Swing Bridge structure. The otherwise moveable swing span element was then fixed in place by Conrail and its contractors. This step allowed the restoration of rail traffic over the Swing Bridge, but it closed the waterway to some of the marine traffic in the area.

20. Federal regulations, however, require that the "draw" of the Conrail railroad bridge located in Paulsboro, New Jersey be maintained in the open position to vessels from March through November. *See* 33 C.F.R. §117.729(a)(1). The bridge may only be closed for the passage of trains and to perform periodic maintenance. *Id.* From December through February, the federal regulations permit the draw to remain in the closed position but provide that the draw must open if at least four hours' notice is given. *Id.* at §117.729(a)(2).

21. In light of the time required for the necessary engineering work and environmental and other permitting processes, and in light of the limited construction windows, among other constraints, Conrail requested that the Coast Guard allow the draw of the bridge to remain closed to the passage of vessels until September 2014.

6

22. The Coast Guard took the position that maintaining the bridge in its fixed position created an unreasonable obstruction and hazard to navigation. In a letter dated March 13, 2013, the Coast Guard wrote:

> "You[, Conrail], as owner, are responsible for the operation, maintenance and repair of the bridge in accordance with the applicable statutes and regulations. Pursuant to the authority of the Rivers and Harbors Appropriation Act of 1899, as amended by the Coast Guard Authorization Act of 1982, it has been determined that the current bridge reconfiguration after the accident as a low-level fixed-span bridge is negatively impacting mariners and is an unreasonable obstruction and hazard to navigation. This places CONRAIL in violation of Title 33 U.S.C. 493 – Obstruction of navigation."

23. The Coast Guard's March 13, 2013 letter ordered Conrail to take the following actions to avoid imposition of civil penalties:

> "a. Within 90 days … the Coast Guard is [to be] provided preliminary plans for a replacement drawbridge.
>
> b. Within six months … the Coast Guard is [to be] provided definitive engineering plans and timetable for a replacement drawbridge; and
>
> c. Construction of the new drawbridge must commence within one year …."

24. To comply with the Coast Guard's order, Conrail had to develop plans for a bridge construction project on an expedited basis and had to submit to the Coast Guard both preliminary and definitive engineering plans as well as a timetable for the bridge project.

25. In developing the plans, Conrail's engineers, Modjeski and Masters ("Modjeski"), evaluated three possible corrective actions. The engineers referred to these as the (1) "No Build / Do Nothing Alternative," (2) "Rehabilitation Alternative," and (3) "Replacement Alternative." The first alternative was to leave the Swing Bridge as is. The second alternative was to repair the Swing Bridge, so that it could swing to accommodate marine traffic. The third alternative

7

was to replace the Swing Bridge with a more modern bridge design that would open vertically (a "Vertical Lift Bridge").  Modjeski concluded that the first alternative undisputedly violated Coast Guard navigability requirements because it would leave a fixed bridge – blocking passage of marine traffic on Mantua Creek.

26. After carefully analyzing the other two alternatives, Modjeski concluded that federal law, namely Executive Order 11988, mandated the Replacement Alternative, i.e., replacement of the Swing Bridge with a Vertical Lift Bridge.  Executive Order 11988, issued on May 24, 1977 in furtherance of the National Environmental Policy Act of 1969, as amended (42 U.S.C. § 4321 *et seq.*), mandates that federal agencies minimize potential harm presented by projects within a floodplain such as that in which the Swing Bridge was located.  Given its requirements, the Executive Order would not permit the Coast Guard to authorize the Rehabilitation Alternative.

27. Specifically, Executive Order 11988 states that its purpose is "to avoid to the extent possible the long and short term adverse impacts associated with the occupancy and modification of floodplains and to avoid direct or indirect support of floodplain development wherever there is a practicable alternative."  The Executive Order further directs that "[e]ach agency shall provide leadership and shall take action to reduce the risk of flood loss, to minimize the impact of floods on human safety, health and welfare, and to restore and preserve the natural and beneficial values served by floodplains in carrying out its responsibilities for … conducting Federal activities and programs affecting land use, including but not limited to water and related land resources planning, regulating, and licensing activities."

28. Executive Order 11988 also provides:

> "If an agency has determined to, or proposes to, conduct, support, or allow an action to be located in a floodplain, the agency shall

8

> consider alternatives to avoid adverse effects and incompatible development in the floodplains.… Each agency shall take floodplain management into account when formulating or evaluating any water and land use plans and shall require land and water resources use appropriate to the degree of hazard involved. Agencies shall include adequate provision for the evaluation and consideration of flood hazards in the regulations and operating procedures for the licenses, permits, loan or grants-in-aid programs that they administer.  Agencies shall also encourage and provide appropriate guidance to applicants to evaluate the effects of their proposals in floodplains prior to submitting applications for Federal licenses, permits, loans or grants."

29. Prior to the Derailment, the Swing Bridge did not comply with the requirements of Executive Order 11988 (issued in 1977) to minimize impacts on the floodplain.  However, because of its age (100+ years), it was "grandfathered" under the Coast Guard regulations so long as it was intact.  Upon the Derailment and the resulting, substantial damage to the Swing Bridge, the Coast Guard could and did require that any repairs minimize floodplain impacts as required by Executive Order 11988.

30. Modjeski determined that the Rehabilitation Alternative failed to minimize floodplain impacts as required by Executive Order 11988.  The Rehabilitation Alternative would result in a bridge insufficiently elevated for present-day high water and flood levels of Mantua Creek.  In particular, Modjeski determined that "[a]ccording to the FEMA flood study for this area, the 100-year base flood elevation is at 8.9 feet above sea level ('asl')."  It also determined that "[t]he current elevation of the low steel of the existing swing bridge is found at 2.77 feet asl and would remain at that elevation in the Rehabilitation Alternative."  Put otherwise, "[t]he bridge resulting from the Rehabilitation Alternative thus acts as an obstruction to the floodplain for any tidal flood levels more than 0.22 feet [*i.e.*, 2.64 inches] in excess of the mean high water elevation."  Because "the Rehabilitation Alternative does not minimize floodplain impacts," it would not comply with the Coast Guard's requirements.

9

31. In contrast, the Replacement Alternative's Vertical Lift Bridge could be both raised above the mean high water elevation and removed from the 100-year base floodway. Thus, that alternative would minimize floodplain impacts and protect the natural and beneficial values of the floodplain.

32. Accordingly, the engineers determined that the Replacement Alternative's Vertical Lift Bridge was required under federal law:

> "The Replacement Alternative compares favorably to the Rehabilitation Alternative with respect to all the potential impacts of the project. First, with respect to the floodplain, the elevation of the low steel of the proposed vertical lift bridge is found at 5.25 feet asl, several feet higher than the low steel of the Rehabilitation Alternative. The Replacement Alternative will accordingly better accommodate tidal flood levels in excess of the mean high water elevation.
>
> The removal and relocation of substructure units through the Replacement Alternative will also result in a positive benefit to the flood characteristics of Mantua Creek as compared to the rehabilitation of the existing bridge because the substructure units of the Replacement Alternative will be located in shallower water depths. Finally, as compared to maintaining or rehabilitating the swing span bridge, the vertical lift element of the Replacement Alternative will provide more operational flexibility to accommodate floods and higher tides because, with the proposed project, the bridge structure can be raised to a minimum clearance of 25 feet above the mean high water elevation and be removed from the 100 year base floodway. The existing swing bridge – in its current or repaired condition – does not have this operational flexibility and cannot be removed from the 100 year base floodway. Accordingly, the Replacement Alternative presents additional measures beyond those found in the Rehabilitation Alternative to minimize floodplain impacts and to protect the natural and beneficial values of the floodplain."

33. On November 20, 2013, Conrail, in consultation with the Coast Guard, submitted a formal application for a Coast Guard Bridge Permit to authorize Conrail to replace the inoperable Swing Bridge with a Vertical Lift Bridge that would restore navigation to the waterway, as required by the Coast Guard's order.

34. Conrail proposed a Vertical Lift Bridge because the Coast Guard ordered Conrail to restore the navigable condition of Mantua Creek and to do so within a strictly constrained time period. Conrail had little choice but to use the Vertical Lift Bridge to comply with that order.

35. On April 24, 2014, the U.S. Coast Guard granted Conrail's permit to construct the Vertical Lift Bridge.

36. Construction of the Vertical Lift Bridge was completed in March 2016.

## THE COVERAGE CONTROVERSY

37. Conrail sought coverage from the Insurers for the property damage and associated losses it has sustained in excess of the attachment point of the Insurers' Policies, i.e., for amounts in excess of $15 million.

38. Conrail reasonably expected the Policies to cover property damage and related losses sustained as the result of the Derailment and reasonably relied upon the Policies for protection against such losses.

39. Given the numerous provisions in the policies covering consequential losses, the parties contemplated protecting Conrail against consequential damages.

40. Conrail provided to the Insurers a spreadsheet supporting its final Proof of Loss in connection with the Derailment on December 6, 2016. The total amount of loss indicated in that spreadsheet was $18,440,406. Thus, a total of at least $3,440,406 implicates the Insurers' Policies, which attach excess of $15 million.

41. Although Conrail's final Proof of Loss included a component for Extra Expense, in the amount of $1,224,000, the Insurers are estopped from denying liability for the greater amount of business interruption loss Conrail incurred, due to the conduct described at ¶¶ 48-54 below.

42. Conrail requested that the Insurers, either individually or collectively, provide a Proof of Loss form for Conrail to execute, reflecting the figures in the spreadsheet provided by Conrail. The Insurers failed to provide Conrail with a Proof of Loss form.

43. All required premiums due under the Policies have been timely paid, and all conditions and requirements imposed by the Policies upon the insureds thereunder have been satisfied and/or have been waived and/or are subject to an estoppel against the Insurers. All of the Policies have been in full force and effect at all pertinent times.

44. Before denying coverage, the Insurers never independently investigated Conrail's claim. Instead, they relied on the adjusters—first Mr. Ratcliff and then his replacement Robert Steller—acting as their agents, to do so.

### A. Dispute About Repair Versus Replacement of the Bridge

45. Following the Derailment, Conrail was in close communication with the Insurers' authorized agent—the adjuster, Mr. Ratcliff—about Conrail's evaluation of options to address the damaged Swing Bridge and restore marine traffic on Mantua Creek. This communication included, among other things, providing Mr. Ratcliff with alternative proposals from Conrail's engineers to address the damaged Swing Bridge.

46. The Insurers assert that their Policies do not cover the costs of construction of the Vertical Lift Bridge and the other related loss that Conrail has sustained from the Derailment. The Insurers incorrectly assert that Conrail could have received approval from the U.S. Coast Guard to repair the heavily damaged, 100 year-old Swing Bridge, or to restore it to its original 19th century design. They contend that the costs of such a repair or restoration would not reach the attachment point of their Policies.

### B. Dispute About Business Interruption

47. Between May 2013 and July 2015, Mr. Ratcliff and Jonathan Broder, Vice President – Corporate Development and Chief Legal Officer of Conrail, spoke by telephone, emailed and met in person to discuss the valuation of Conrail's business interruption claim. For example, Mr. Ratcliff sent Mr. Broder an email on April 1, 2014 advising that his clients wanted to look at Conrail's loss as a "normal business interruption claim in which a claim is submitted for the revenue loss during the eight days the bridge was out of service."

48. In June 2014, Mr. Ratcliff demanded Conrail provide significant documents and information accounting for business interruption losses arising out of the Derailment. Ultimately, Conrail and Mr. Ratcliff agreed that FTI Consulting, Inc. ("FTI") would be retained to work with Conrail to provide the requested cost information and analysis.

49. In July 2015, Mr. Ratcliff was replaced by Robert Steller of York Risk Services Group, who subsequently issued to Conrail a revised request for business interruption-related cost information seeking additional information, documents and accounting records about Conrail's business interruption losses.

50. In November 2015, Conrail provided Mr. Steller a letter from FTI calculating Conrail's total business income loss of $1,962,032.

51. Mr. Steller advised Conrail in June 2016 that the Insurers' business loss consultant, MDD Forensic Accounting, calculated Conrail's business interruption loss to be $1,781,394.

52. Despite discussions concerning, and valuation of, Conrail's business interruption claim for a period of over three years, the Insurers' agent-adjuster, Mr. Steller, in August 2016 advised Conrail for the first time that there is no coverage for business interruption losses. That

position was based on information fully available to the Insurers and their agent-adjusters as early as when the Derailment occurred and the Insurers were placed on notice.

53. Insurers have offered Conrail no explanation as to why they, through or in conjunction with their agent-adjusters, required Conrail to expend significant time and expenses compiling information about its business interruption losses even if—as they now assert—the Policies do not cover business interruption losses.

## COUNT ONE – BREACH OF CONTRACT

54. Paragraphs 1 through 53 are incorporated by reference herein.

55. Conrail has incurred substantial financial losses as a result of the Derailment. The losses include (1) the construction of the Vertical Lift Bridge and (2) other related losses, including business interruption loss and extra expense. Conrail's losses from the Derailment are covered under the Insurers' Policies.

56. The Insurers have refused to satisfy their obligations under the Policies to pay for the costs of construction of the Vertical Lift Bridge and other property damage-related loss, including business interruption loss and extra expense, that Conrail has sustained as a result of the Derailment. The Insurers have thereby breached their contracts of insurance.

57. As a direct and proximate result of the Insurers' breach of their contracts of insurance, Conrail has been deprived of the benefits of property insurance coverage for which it paid substantial premiums. By depriving Conrail of its insurance coverage, the Insurers have directly damaged Conrail by forcing it to make expenditures and to incur losses that should be borne by the Insurers.

58. Further, as a result of such breach of contract, Conrail has been forced to incur— and will continue to incur—additional, reasonably foreseeable consequential damages, including

but not limited to the attorneys' fees and other expenses in prosecuting this action, lost executive time, and the lost earnings on amounts wrongfully withheld by the Insurers. These damages are not subject to any limits of liability stated in the Policies.

## COUNT TWO – DECLARATORY RELIEF

59. Paragraphs 1 through 58 are incorporated by reference herein.

60. Each of the Insurers is obligated to provide coverage benefits to Conrail for its losses arising out of the Derailment on all of the terms set forth in paragraphs 9 through 16.

61. None of the Insurers has accepted its obligation to provide coverage for Conrail's Derailment-related loss on the terms described in paragraphs 9 through 16, and Conrail has reason to believe that none will accept such terms.

62. Conrail has incurred and may continue to incur substantial financial losses and expenses in connection with losses arising out of the Derailment that are covered under the Policies and anticipates that additional losses and expenses may be incurred in connection with such losses.

## COUNT THREE – BAD FAITH

63. Paragraphs 1 through 62 are incorporated by reference herein.

64. The Insurers have insured Conrail voluntarily under the policies identified above, pursuant to which they have assumed a duty of good faith and fair dealing in resolving and paying Conrail's valid claims. Notwithstanding their obligations under those policies, the Insurers have, either independently or through or in conjunction with their agent-adjusters, denied Conrail's valid claims without a reasonable and/or fairly debatable basis.

65. The Insurers' course of dealing with Conrail has included violations of Pennsylvania's Unfair Insurance Practices Act, 40 PA. STAT. §§ 1171.1–1171.15,

Pennsylvania's Unfair Claims Settlement Practices Regulations, 31 PA. CODE §§ 146.1–146.8, New Jersey's Insurance Trade Practices Act, N.J. Stat. Ann. § 17:29B-4 *et seq.*, and/or common law, including but not limited to the conduct described in paragraphs 37 through 53 above.

66. On numerous occasions following the Derailment, Conrail and the Insurers' authorized agent-adjusters (first Mr. Ratcliff and then Mr. Steller) discussed Conrail's business interruption loss. The Insurers' agent-adjusters repeatedly and routinely demanded information, documents, and accounting records about revenue loss and related business interruption losses. Conrail incurred significant expense and both executive and administrative effort in preparing responses to these repeated demands. In so doing it relied to its detriment upon the representations of the Insurers' agent-adjusters, such as Mr. Ratcliff's statement that the Insurers would treat Conrail's loss as a "normal business interruption claim in which a claim is submitted for the revenue loss during the eight days the bridge was out of service." The conduct of the Insurers and their agent-adjusters demonstrates that they—like Conrail—interpreted the Policies as covering Conrail's business interruption losses. In espousing a revised interpretation of the Policies and denying coverage for business interruption, the Insurers adduced no new information to justify their reversal of position, relying instead solely on information available to them from the time they first received notice of the Derailment.

67. As a result of the conduct of the Insurers, through or in conjunction with its agents, Messrs. Ratcliff and Steller, Conrail has been harmed in the form of lost executive and administrative time, expenses incurred to provide information to the Insurers or their agents or consultants regarding Conrail's business interruption loss, and delay in the Insurers' payment of such loss.

68. The Insurers' actions and conduct, on their own and/or in conjunction with their

agents, Messrs. Ratcliff and Steller, demonstrate and constitute bad faith in violation of 42 Pa. C.S.A. § 8371 and bad faith breach of contract under Pennsylvania law, and/or bad faith under New Jersey common law, for which Conrail is entitled to consequential damages and extracontractual relief.

69. The Insurers' conduct has also breached their duties of good faith and fair dealing, because they have exercised their discretionary authority arbitrarily, unreasonably, or capriciously, to prevent Conrail from receiving its reasonably expected Policy benefits.

70. Additionally, the Insurers have committed bad faith as a result of their failure to acknowledge coverage for the cost of a replacement bridge and refusal to acknowledge that a 19th century bridge design would not comply with modern floodplain regulations, as described in paragraphs 45 to 46.

## REQUEST FOR RELIEF

WHEREFORE, on Count One, Conrail prays for relief as follows:

(a) actual compensatory and consequential damages sustained by Conrail as a result of the Insurers' breach of their contracts, plus interest according to law, in amounts to be established through proof at trial;

(b) reasonable attorneys' fees and other costs incurred by Conrail in prosecuting this action against the Insurers; and

(c) such other and further relief as this Court may deem just and proper.

WHEREFORE, on Count Two, Conrail prays for relief as follows:

(a) a declaration that each of the Insurers, pursuant to the terms of its respective Policies, must provide coverage benefits to Conrail for its Derailment-related losses on all the terms set forth in paragraphs 9 through 16;

17

        (b)       reasonable attorneys' fees and other costs incurred by Conrail in prosecuting this action against the Insurers; and

        (c)       such other and further relief as this Court may deem just and proper.

WHEREFORE, on Count Three, Conrail prays for relief as follows:

        (a)       actual compensatory and consequential damages sustained by Conrail as a result of the Insurers' bad faith, plus interest according to law, in amounts to be established through proof at trial;

        (b)       punitive damages, plus interest according to law, in amounts to be established through proof at trial;

        (c)       reasonable attorneys' fees and other costs incurred by Conrail in prosecuting this action against the Insurers; and

        (d)       such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Dated: November 30, 2017              *s/ Lisa J. Rodriguez*
SCHNADER HARRISON SEGAL & LEWIS LLP
By: Lisa J. Rodriguez
(ljrodriguez@schnader.com)
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Cherry Hill, NJ 08002-1165
(856) 482-5741

*Counsel for Consolidated Rail Corporation*

        Rukesh Korde (rkorde@cov.com)
        Scott J. Levitt (slevitt@cov.com)
        COVINGTON & BURLING LLP
        850 Tenth Street NW
        Washington, DC  20001
        (202) 662-6000

*Of Counsel for Plaintiff Consolidated Rail Corporation*

## **JURY DEMAND**

Conrail hereby demands a trial by jury.

Dated: November 30, 2017

       *s/ Lisa J. Rodriguez*
SCHNADER HARRISON SEGAL & LEWIS LLP
By:  Lisa J. Rodriguez
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Cherry Hill, NJ  08002-1165
(856) 482-5741

*Counsel for Consolidated Rail Corporation*

Rukesh Korde (rkorde@cov.com)
Scott J. Levitt (slevitt@cov.com)
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC  20001
(202) 662-5661

*Of Counsel for Plaintiff Consolidated Rail Corporation*