NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| CONSOLIDATED RAIL CORPORATION, | |
| Plaintiff, | Civil No. 17-12281 (RBK/KMW) |
| v. | **OPINION** |
| ASPEN SPECIALTY INSURANCE COMPANY, *et al.*, | |
| Defendants. | |

**KUGLER**, United States District Judge:

This matter comes before the Court on Defendant Hudson Specialty Insurance Company's motion for summary judgment (Doc. No. 38) and Plaintiff Consolidated Rail Corporation's ("Conrail") cross-motion for summary judgment (Doc. No. 39) as to whether Conrail's suit is barred by a suit limitation clause in the parties' insurance contract. Separately, Conrail has moved for summary judgment against Hudson and two other insurers in this case as to whether the insurers must pay certain costs under "law and ordinance" provisions in their contracts. (Doc. No. 31).

For the reasons below, Hudson's motion for summary judgment on the suit limitation issue is **GRANTED**, and Conrail's cross-motion for summary judgment is **DENIED**; and Conrail's separate summary judgment motion regarding the "law and ordinance" issue is **DENIED AS MOOT** insofar as it relates to Conrail's claims against Hudson.

1

## I. BACKGROUND[1]

This case involves an insurance dispute between Conrail—a rail service provider for freight shipments—and one of its three excess-layer insurance carriers, Hudson. Conrail claims that under its policy with Hudson, Hudson must pay for the costs Conrail incurred in reconstructing a bridge on which a train derailed in November 2012. Hudson contends that Conrail's claims are time barred under the policy.

### A. Policy Underwriting

In 2012, Conrail engaged an insurance broker, Aon, to solicit quotes from multiple insurers to assemble a property insurance program. (Doc. No. 39-2 ("Pl.'s Counter SMF") at ¶ 1.) Conrail sought to assemble a property insurance program with a total limit of one-hundred million dollars excess of a five-million-dollar self-insured retention. (*Id.*) In soliciting quotes from interested insurers, Aon sent the interested insurers a "Submission" that contained, among other things, certain "Program Specifications." (*Id.* at ¶ 2.)

Aon sent the Submission with its Program Specifications to Hudson, an interested insurer. (*Id.* at ¶ 4.) In the Submission sent to Hudson, Conrail laid out various specifications, including "required wording" set forth in an attached manuscript form. (Doc. No. 39-4 at 13.) The Submission stated that an interested insurer like Hudson must note in its quote any deviations or exceptions from these specifications. (*Id.* at 9.)

Thereafter, Hudson submitted a quote to participate in Conrail's property insurance program for the 2012-2013 period. (Pl.'s Counter SMF at ¶ 7.) Hudson's quote noted that the "terms and conditions may be different than those presented in the submission" and noted that it

---

[1] In addition to the relevant record evidence, the facts are drawn from the parties' Statements of Material Facts ("SMF") where the parties admit the facts asserted. *See* L. Civ. R. 56.1(a). Disputed facts are noted accordingly.

"excludes terrorism coverage." (Doc. No. 39-6 at 1.) It also noted that "the policy wording that will be used is Hudson's US Property Master form," which it attached,[2] though it also stated under a heading for "form[s] and endorsements" that the form would be the manuscript form. (*Id.* at 1, 4.) Under the same heading for "form[s] and endorsements," Hudson listed several endorsements but nothing specifically mentioning a clause that would impose a contractual time limit on Conrail's ability to sue Hudson. (*Id.* at 4.) Conrail then accepted Hudson's quote. (Pl.'s Counter SMF at ¶ 11.)

After Conrail accepted Hudson's quote, Hudson issued a binder for its policy dated May 30, 2012. (*Id.*; *see also* Doc. No. 39-7.) The binder indicated that the policy would become effective on June 1, 2012 and expire on June 1, 2013. (*Id.* at 1.) It also included a "form[s] and endorsements" heading that contained information that mirrored the information contained under the same heading in Hudson's quote. (*Id.* at 4.)

Hudson eventually issued its policy to Conrail. (Doc. No. 38-2 ("Def.'s SMF") at ¶ 2.) In the eventual Complaint filed in this matter, Conrail attached what it described as a "true and correct copy" of its "policy" with Hudson. (Doc. No. 1 ("Compl.") at ¶ 10.) That "true and correct" policy contains several parts, including a "Conditions" form. (Doc. No. 1-2 at 39–44.) Paragraph 21 of the "Conditions" form imposes a one-year contractual time limit on Conrail's right to sue Hudson. (*Id.* at 43, ¶ 21.) It reads:

> No suit, action or proceeding for the recovery of any claim under this Policy shall be sustainable in any court of law or equity unless the same be commenced within Twelve (12) months next after discovery by the Insured of the occurrence which gives rise to the claim. Provided, however, that if by the laws of the State within which this Policy is issued such limitation is invalid, then any such claims shall be void unless such action, suit or proceeding be commenced within the shortest limit of time permitted by the laws of such State.

---

[2] It is not clear where, if at all, the US Property Master form document appears in the record before the Court.

(*Id.*)  Paragraph 29 of the "Conditions" form also includes a "conflict of wording" clause, which states that "[i]f there is any conflict between these [Conditions] and the language contained in the Policy forms or endorsements, it is agreed that the latter shall govern." (*Id.* at 44, ¶ 29.)

Another relevant clause exists in the "General Conditions" portion of the "true and correct" policy. (*Id.* at 9–15.) That clause, which deals with proof of loss, reads:

> In case of loss, the Insured is hereby permitted to immediately make all necessary repair or replacement.  Due notice of such loss, when it appears the amount thereof will exceed the amount of the retention provided herein; however, the Insured shall not be required to render proof of loss until such loss has been repaired or replaced, when proof of loss and statements shall be rendered for settlement.

(*Id.* at 11, ¶ 6(B).)

### B. Train Derailment

After the policy issued, a train derailed and led to this dispute.  On November 30, 2012, a Conrail train derailed while crossing a bridge that spanned Mantua Creek at river mile 1.3 in Paulsboro, New Jersey.  (Def.'s SMF at ¶ 6.)  Acting through its insurance broker, Conrail notified its insurers of the derailment on the same day it occurred and sought insurance coverage for the costs that Conrail would incur to repair or replace the damaged bridge.  (*Id.* at ¶ 7.)

By letter dated January 29, 2013, Conrail informed the United States Coast Guard of its intention to design and construct a new bridge and that Conrail had already taken preliminary steps to that end.  (Pl.'s Counter SMF at ¶ 18.)  On March 13, 2013, the Coast Guard responded, requiring Conrail to apply for a permit for a "replacement drawbridge."  (*Id.* at ¶ 19.)  The Coast Guard issued Conrail's permit on April 24, 2014, and Conrail completed its bridge construction in March 2016.  (*Id.* at ¶¶ 20–21.)

### C. Coverage Denial and This Case

After Conrail finished construction on the bridge, the parties engaged in a series of communications regarding insurance coverage. On April 12, 2016, Hudson and the other excess insurers in this case sent Conrail a letter stating that "[t]he excess of the primary AIG layer have received [Conrail's] correspondence from April 11, 2016," and that "[t]he excess files are inactive given the current measure of the claim by AIG." (Doc. No. 38-4 at Ex. D.) Then, in December 2016, Conrail provided a proof of loss to Hudson indicating, among other things, that the bridge construction cost $13,974,639, or $9,288,328 more than the original construction configuration. (Pl.'s Counter SMF at ¶ 22.) Thereafter, by letter dated March 5, 2017, York Specialized Loss Adjusting, on behalf of Hudson and Conrail's other excess insurers, denied Conrail's claim. (*Id.* at ¶ 23.)

On November 30, 2017, Conrail filed the Complaint in this matter against Hudson and the other insurers. (*See generally* Compl.) Conrail brought three claims: (1) breach of contract, (2) declaratory relief, and (3) bad faith. (*Id.* at ¶¶ 54–70.) The Complaint contains no mention of the suit limitation clause that restricts Conrail's ability to sue outside the one-year period, even though that clause appears in the "true at correct" copy of Hudson's policy that Conrail attached to the Complaint. (*Id.* at ¶ 10.) Conrail has not amended the Complaint to include allegations relating to the suit limitation clause. Nor has Conrail included a claim for reformation of its contract with Hudson. In its Answer to the Complaint, Hudson asserted in its fourth affirmative defense that Conrail's claims were "barred by the suit limitation period in the Hudson Policy." (Doc. No. 16 at 11.)

The case and discovery then proceeded in phases. (Doc. No. 25.) By order of the Court on May 7, 2018, Magistrate Judge Williams directed the parties to submit a joint discovery plan.

(Doc. No. 22.) Conrail submitted that plan, which suggested that the case proceed in three Phrases, with Phase I dedicated to resolving "whether the suit limitation clause in the Hudson Policy, (*i.e.* Section 21 of the Hudson Policy's Conditions) can be enforced to preclude this lawsuit against Hudson," and whether law and ordinance provisions in all of the excess insurers' policies require the excess insurers to pay for the cost of repairing the bridge. (Doc. No. 24 at 1.) Magistrate Judge Williams then issued her Case Management Order, which adopted, among other things, the position that Phase I of this litigation would involve whether "the suit limitation clause in the Hudson Policy (*i.e.* Section 21 of the Hudson Policy's Conditions)" bars Conrail's suit against Hudson. (Doc. No. 25 at 1.)

The instant motions involve the first of the two Phase I issues. Pointing to the suit limitation clause in the "true and correct" copy of the Hudson policy that Conrail attached to the Complaint, Hudson now moves for summary judgment, arguing that Conrail's claims against it are time barred because Conrail filed the Complaint in this case after the one-year period expired. (Doc. No. 38-1 ("Def.'s Br.").) Conrail has opposed the motion and cross-moved for summary judgment, arguing that the suit limitation clause does not bar its claims against Hudson for various reasons. (Doc. No. 39-1 ("Pl.'s Br.").)[3]

## II. STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law." *Anderson v. Liberty*

---

[3] Both parties also filed sur-replies. (Doc. Nos. 45, 52.) In seeking leave to do so, Conrail requested an opportunity to "respond" to what it claimed were "new facts and new arguments," including "facts [Hudson] failed to disclose in discovery." (Doc. No. 43-1 at 1.) Nevertheless, much of Conrail's sur-reply addresses issues outside the scope of these "new" issues that the Court granted leave to address. (Doc. No. 45.)

6

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Id.* The movant bears the burden of showing the absence of a "genuine issue of material fact." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). The party may satisfy its burden by "produc[ing] evidence showing the absence of a genuine issue of material fact" or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

If the movant makes this showing, the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmovant must "point to concrete evidence in the record that supports each and every essential element of his case." *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995). "When opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002)). The Court's role is not to weigh the evidence and decide the truth, but to determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In making that decision, "[a]ll facts and inferences are construed in the light most favorable to the non-moving party," *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998), and credibility determinations are for the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

### III. DISCUSSION

The parties dispute three main issues. First, the parties dispute whether New York law prevents the Court from enforcing the policy's suit limitation clause because Conrail could not

have complied with it.[4] Second, the parties dispute whether the suit limitation clause can be enforced in light of a "conflict of wording" provision. Finally, the parties dispute whether the suit limitation clause is even part of their contract. The Court finds that the suit limitation clause is enforceable against Conrail and that Conrail cannot now claim that it did not agree to the suit limitation clause.

### A. Enforceability

The suit limitation clause in Hudson's policy is not unreasonable and is enforceable against Conrail. Under New York law, "parties to a contract may designate a statute of limitations within which a claim arising out of the contract is to be brought, even if that period is shorter than that designated by statute." *T.N. Metro Holdings, I, LLC v. Commonwealth Ins. Co.*, No. 11-cv-6063, 2016 WL 7243554, at *4 (S.D.N.Y. Dec. 14, 2016). Because there is "nothing inherently unreasonable" about shortening a limitation period, the New York Court of Appeals has "enforced contractual limitation periods of one year," and even those as short as six months. *Exec. Plaza, LLC v. Peerless Ins. Co.*, 22 N.Y.3d 511, 518 (2014). To be enforced, however, the shortened period must still be reasonable under the circumstances. *See id.* (holding that two-year limitation period was "not reasonable" in light of its "accrual date").

Here, the suit limitation clause requires Conrail to sue Hudson within one year "of the occurrence which gives rise to the claim." (Def.'s SMF at ¶ 5.) According to Hudson, this clause bars Conrail's claims against Hudson because Conrail learned of the train derailment—the

---

[4] Because the parties agree that New York law applies to determine the enforceability of the suit limitation clause, the Court will apply New York law to the issue as noted below. (Pl.'s Br. at 6 n.2; Def.'s Br. at 3–5.) Indeed, the policy states that it "shall be interpreted solely according to the law of the State of New York without regard to the choice of law provisions of New York." (Def.'s SMF at ¶ 4.)

8

"occurrence" giving rise to the claim—on November 30, 2012 but waited five years to file the Complaint on November 30, 2017. (Def.'s Br. at 6.)

Conrail does not refute that the limitation period began to run from the date that it learned of the derailment in November 2012, i.e., the "occurrence" giving rise to the claim.[5] Instead, Conrail argues that the Court should not enforce the one-year limitation because Conrail could not have reasonably complied with the one-year time frame. (Pl.'s Br. at 6–8.) In Conrail's view, "completing repair and replacement of damaged property within a year would be impossible" under the circumstances of a major train derailment. (*Id.* at 6.) In support of this claim, Conrail relies on *Executive Plaza*, in which the New York Court of Appeals declined to enforce a two-year

---

[5] In a footnote in its sur-reply, Conrail argues that the suit limitation clause can "reasonably be interpreted" to start its one-year period not from the derailment date, but "*only* when [Conrail's] total loss amounts have been determined." (Doc. No. 45 at 6 n.3 (emphasis in original).) Even if the Court considered this as a non-waived argument, which Conrail raised for the first time in its sur-reply and is outside the scope of the "new arguments and facts" that Conrail sought leave to address (Doc. No. 43-1 at 1), the Court would reject it. To support its claim that the one-year period began only when Conrail's total loss amounts were determined, Conrail cites the definition of "occurrence" in the policy's "Conditions" form, which contains the suit limitation clause. (Doc. No. 45 at 6 n.3.) That form defines "occurrence" as "any one loss, disaster or casualty or series of losses, disasters or casualties arising out of one event." (Doc. No. 1-2 at 44, ¶ 28.) Under this definition, the one-year period would thus begin when Conrail discovered the loss, disaster, or casualty (or series thereof) arising from one event. But contrary to Conrail's claim, this language is consistent with Hudson's position that the "occurrence" giving rise to the claim is the derailment and Conrail's corresponding knowledge that it would need insurance coverage for costs incurred to repair or replace the damaged bridge—its "loss." (Def.'s SMF at ¶ 7.) In isolating Conrail's "loss" for purposes of determining the causative "occurrence" under this definition, it would also be strange—as Conrail insists—to understand the word "loss" as referring to calculable damages when the very peril the policy insures against is loss or damage to covered property. (Doc. No. 45 at 6 n.3.) Moreover, finding that the derailment was the causative "occurrence" giving rise to the claim is consistent with New York appellate authority interpreting a property insurance contract that contained the same language as the policy here. *See J. N. Futia Co. v. Nat'l Sur. Corp.*, 30 A.D.2d 989, 990 (3d Dep't 1968) (holding that discovery of "the occurrence which gives rise to the claim" as used in contractual limitation clause "is the event or fact of infliction of physical damage to the Property and not the ascertainment of the quantum of monetary damage sustained by the Owner").

9

suit limitation clause because it was "neither fair nor reasonable" to do so under the circumstances of that case. 22 N.Y.3d at 518. But *Executive Plaza* does not apply here.

In *Executive Plaza*, the defendant insurer issued a fire policy to the plaintiff insured that required the plaintiff to sue for loss or damage within two years of a fire. *Id.* at 516. If seeking to recover replacement costs, the policy further required the plaintiff to replace the property before suing. *See id.* Thus—if as happened in the case—the process of replacing the property took more than two years, the policy time barred the insured's claim before it came into existence. *See id.* In finding the suit limitation clause unenforceable, the Court of Appeals explained that "[i]t is neither fair nor reasonable to require a suit within two years from the date of the loss, while imposing a condition precedent to the suit—in this case, completion of replacement of the property—that cannot be met within that two-year period." *Id.* at 518. As the Court of Appeals explained, a limitation period that "expires before suit can be brought is not really a limitation period at all, but simply a nullification of the claim." *Id.*

Another fact troubled the Court of Appeals. As it noted, an insured may protect itself by either beginning an action before the expiration of the limitation period or obtaining from the carrier a waiver or extension of its provision. *Id.* at 519 (citing *Blitman Const. Corp. v. Ins. Co. of N. Am.*, 66 N.Y.2d 820, 823 (1985)). And in *Executive Plaza*, the insured did begin an action on the last day of the limitation period, but the insurer successfully argued that the action was brought too soon because replacement was not yet complete. *Id.* In light of this position, the Court of Appeals reasoned that "[i]t is unreasonable for [the insurer] now to say . . . that [beginning an action] a day later would have been too late." *Id.*

This case differs from *Executive Plaza* in several ways. Unlike the *Executive Plaza* policy that imposed a condition precedent to suit that could not be met within the two-year limitation

period, Hudson's policy imposes no requirements that made a timely lawsuit impossible. Although Conrail suggests that it could not have sued Hudson until the Coast Guard approved a replacement bridge design and until Conrail completed construction, Conrail identifies no term in the policy that makes these events prerequisites to a suit against Hudson. (Pl.'s Br. at 7.) Nor, as Conrail suggests, does Hudson's policy require Conrail to submit proof of loss (which it did not obtain until later) before it may sue. (*Id.* at 8.) In claiming otherwise, Conrail cites a section of the policy that reads:

> In case of loss, the Insured is hereby permitted to immediately make all necessary repair or replacement. Due notice of such loss, when it appears the amount thereof will exceed the amount of the retention provided herein; however, the Insured shall not be required to render proof of loss until such loss has been repaired or replaced, when proof of loss and statements shall be rendered for settlement.

(Doc. No. 1-2, at 11, ¶ 6(B).) But unlike the *Executive Plaza* policy, nothing in this language suggests that proof of loss is a condition precedent to suit. Instead, the language suggests that this term is simply intended to allow Conrail to repair and replace damaged property before submitting a proof of loss without forfeiting its right to coverage.

Nor is this a case where Hudson tried to have the limitation period both ways. Unlike the *Executive Plaza* insurer, who argued that the plaintiff's suit on the last day of the period was too early only to later contend that the plaintiff's subsequent suit was too late, there is no evidence that Hudson attempted to deny Conrail coverage at any point because the bridge rebuild was not yet complete or because Conrail failed to submit proof of loss to Hudson.

In fact, Conrail does not dispute that it took no action—unlike the diligent plaintiff in *Executive Plaza*—to protect itself from the expiration of the limitation period by filing any suit or requesting any extension from Hudson. Even if Conrail is correct that it could not have brought any action, including a declaratory judgment action, against Hudson until Conrail rebuilt the bridge

11

and its damages became known—a questionable proposition—Conrail still failed to request any extension of the limitation period from Hudson. (Doc. No. 45 at 4–6.) Conrail is more than sophisticated enough to have thought to do so.

Put simply, the limitation period at issue here in no way nullified Conrail's claims. Because Hudson's policy does not impose an impossible-to-meet perquisite before Conrail may sue and because Conrail failed to take any action to protect itself, the Court finds that the one-year limitation is not unreasonable or unenforceable under *Executive Plaza*. *See MPI Tech A/S v. Int'l Bus. Machines Corp.*, No. 15-cv-4891, 2017 WL 481444, at *5 (S.D.N.Y. Feb. 6, 2017) (enforcing three-year contractual limitation period and distinguishing *Executive Plaza* because "[u]nlike the insurance policy at issue in *Executive Plaza*," the parties' agreement "d[id] not impose requirements that would make a timely lawsuit impossible"); *Buck v. Standard Fire Ins. Co.*, No. 15-cv-533, 2016 WL 10100432, at *3–4 n.4 (N.D.N.Y. Sept. 6, 2016) (rejecting reliance on *Executive Plaza* in an attempt to extend the statute of limitation because "a FEMA appeal is not a condition precedent to filing suit under the NFIA or the terms of the SFIP").

Conrail offers no other reason to believe that the one-year period should not be enforced. Thus, the Court will enforce it, as New York courts routinely do. *See Wechsler v. HSBC Bank USA, N.A.*, 674 F. App'x 73, 75 (2d Cir. 2017) ("In general, New York courts have found one-year limitations clauses to be reasonable."); *D'Angelo v Allstate Ins. Co.*, 126 A.D.3d 931, 931 (2d Dep't 2015) (holding, after *Executive Plaza*, that "a one-year time limitation provision for commencing an action under a policy of insurance, such as the subject provision, is valid and enforceable").

**B. Conflict of Wording**

Next, Conrail contends that the Court should not enforce the suit limitation clause contained in the policy's "Conditions" form because the clause conflicts with another provision in the "General Conditions" portion of the policy. (Pl.'s Br. at 8.) And under the "conflict of wording" provision in the "Conditions" form, Conrail argues, the language of the term in the policy's "General Conditions" portion must govern. (*Id.*) The Court disagrees.

In support of its "conflict of wording" theory, Conrail claims that there is a conflict between the one-year suit limitation clause and the following language in the "General Conditions" portion of the policy dealing with proof of loss:

> In case of loss, the Insured is hereby permitted to immediately make all necessary repair or replacement. Due notice of such loss, when it appears the amount thereof will exceed the amount of the retention provided herein; however, the Insured shall not be required to render proof of loss until such loss has been repaired or replaced, when proof of loss and statements shall be rendered for settlement.

(Doc. No. 1-2 at 11, ¶ 6(B).)

Conrail's argument as to the specific "conflict" between this "General Conditions" language and the suit limitation clause is not entirely clear. So far as the Court can tell, Conrail believes that there is a conflict between the "General Conditions" language and the one-year limitation clause because the "General Conditions" language allowed Conrail to submit proof of loss after it rebuilt the bridge, but the limitation clause's one-year period expired long before Conrail finished construction in March 2016 and had that proof of loss. (Pl.'s Br. at 8.)

The Court sees no such (or any) conflict between these clauses. As explained above, the suit limitation clause does not require Conrail to submit a proof of loss before it could sue Hudson. And even assuming—as Conrail contends—that it lacked any legitimate basis to initiate a suit or declaratory action against Hudson until it knew the amount of its damages, Conrail offers no reason

13

to excuse its failure to request an extension of the period. Despite its displeasure with Hudson, Conrail has only itself to blame.

### C. Agreement to Suit Limitation Clause

Finally, Conrail contends—for the first time in opposition to Hudson's motion for summary judgment—that the suit limitation clause "does not form part of the Policy" because "Conrail and Hudson did not agree to include a suit limitation as part of their contract." (Pl.'s Br. at 9.) According to Conrail, "Hudson never proposed or disclosed the anomalous six-page 'Conditions' form" containing the suit limitation clause "at the time the insurance contract was agreed to," but instead, slipped it in after the fact without telling anyone. (*Id.* at 11; *see also* Doc. No. 45 at 7–8.)

The court rejects Conrail's last-ditch attempt to skirt the suit limitation clause for two separate reasons. (Pl.'s Br. at 9–12.) First, Conrail's contentions are not properly before the Court. Second, Conrail is estopped from claiming that the clause is not part of the policy in light of its prior uncorrected averments in this case.

#### 1. Claim Not Properly Before the Court

At bottom, Conrail's argument that the suit limitation clause was not agreed to and does not form part of the policy seeks to reform the "true and correct" policy it attached to the Complaint to omit the suit limitation clause that it contends Hudson slipped in without telling anyone. Indeed, "the thrust of a reformation claim is that a writing does not set forth the actual agreement of the parties." *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 573 (1986). As New York's highest court has stated, reformation may be appropriate when the contract "varies from [the parties'] intent" or, "by some fraudulent practices, there has been . . . insertion of material matter, which would operate as a surprise or a fraud upon a party." *Avery v. Equitable Life Assur. Soc.*, 117 N.Y. 451, 458 (1889); *see also William P. Pahl Equip. Corp. v. Kassis*, 182 A.D.2d 22, 29 (1st Dep't 1992) ("In order to

14

obtain reformation of a written instrument it must be shown that 'the parties came to an understanding, but in reducing it to writing, through mutual mistake, or through mistake on one side and fraud on the other, omitted some provision agreed upon, or inserted one not agreed upon.'").

But Conrail cannot defeat summary judgment based on an unpled reformation claim because it is not properly before the Court. *See Warfield v. SEPTA*, 460 F. App'x 127, 132 (3d Cir. 2012) (holding that the plaintiff waived an unpled claim raised for the first time in opposition to a motion for summary judgment). Nor can Conrail amend the Complaint to introduce that claim through its arguments in opposition to Hudson's motion for summary judgment. *See Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008) (noting that the "proper procedure" for a plaintiff to assert a new claim at summary judgment is to amend the complaint in accordance with the Federal Rule of Civil Procedure 15(a)).[6]

The Court is even less persuaded by Conrail's attempt to reform the policy at this late stage given Conrail's omissions throughout this two-year litigation. Conrail never pled allegations to support its theory of reformation, nor did Conrail attempt to amend the Complaint to include them despite having years to do so. And the allegation that Hudson snuck in the "Conditions" form containing the suit limitation clause—which Conrail claims does not actually form a part of the policy—is directly contradicted by Conrail's earlier averment that it had attached a "true and correct" copy of the policy containing the suit limitation clause. *See Jake Ball Tr. v. Durst*, No.

---

[6] The Court rejects Conrail's contention that the Court should permit it to amend the Complaint by implication to conform "to the issues actually litigated in the case" based on Federal Rule of Civil Procedure 15(b). (Doc. No. 45 at 9, n.5.) That rule, by its own terms, does not apply, for it deals with amendments during and after trial. And as the Court will explain, Conrail could have sought to amend the Complaint at various points in this litigation but chose not to, so the Court will not permit it now by implication.

12-cv-5255, 2015 WL 170550, at *6 (D.N.J. Jan. 13, 2015) (rejecting the plaintiff's attempt to bring a new set of claims in opposition to summary judgment when the new allegations were "directly contradicted" by allegations in prior pleadings). Accordingly, Conrail cannot now defeat summary judgment on this basis.

### 2. Estoppel

Separately, and at this belated stage, Conrail is estopped from claiming that it never agreed to the suit limitation clause and that it does not form part of the policy in light of its previous position that the suit limitation clause was in fact part of the "true and correct" policy.

Judicial estoppel, sometimes called the "doctrine against the assertion of inconsistent positions," prevents a litigant from asserting a position inconsistent with one that she previously asserted in the same proceeding. *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996). "The basic principle . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." *Id.* Judicial estoppel is appropriate if: (1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she previously asserted in a proceeding; (2) the party changed his or her position in bad faith, i.e., in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity. *See Danise v. Saxon Mortg. Servs. Inc*, 738 F. App'x 47, 50 (3d Cir. 2018) (citing *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 777–78 (3d Cir. 2001)). Judicial estoppel, however, is not "inflexible" and is a "fact-specific" issue entrusted to a court's discretion. *In re Kane*, 628 F.3d 631, 639 (3d Cir. 2010).

Here, the Court exercises its discretion to decline Conrail's eleventh-hour attempt to breathe life into its claims against Hudson. Conrail's present claim that the suit limitation clause does not form part of the contract is irreconcilably inconsistent with its previous assertion—certified to this Court under Rule 11—that it had presented a "true and correct" version of the policy containing the suit limitation clause. If, as Conrail claims, the suit limitation clause does not form part of the policy, the document attached to the Complaint would not be "true and correct" as Conrail averred. And Conrail's averment would be false and misleading.

Conrail's inconsistency is significant. Conrail had the documents at issue since 2012, and "once an insurance policy has been received, it constitutes presumptive knowledge of its terms and limits." *Greater New York Mut. Ins. Co. v. United States Underwriters Ins. Co.*, 36 A.D.3d 441, 443 (1st Dep't 2007). Despite being a sophisticated company on notice of the suit limitation clause for five years and having Rule 11 responsibilities to this Court, Conrail never sought to amend the Complaint to correct its assertion that the true and correct policy contained the suit limitation clause. Conrail also failed to correct the inconsistency (or even hint at the no-assent issue) through an amended pleading after Hudson's Answer included the suit limitation clause as the basis for its fourth affirmative defense. (Doc. No. 16 at 11.) And these failures are no small matter—the clause is so important to this litigation that it forms the basis of an entire dispositive issue, and in focusing a Phase of the case around it, Magistrate Judge Williams' Case Management Order adopted the notion, as suggested by Conrail's filing, that the suit limitation clause was "in the Hudson Policy." (Doc. No. 25 at 1.)

Declining corrective action, Conrail took a different tack: spring the issue on Hudson and the Court in opposition to Hudson's motion for summary judgment, only then to accuse Hudson of failing to provide evidence that the clause is part of the contract. (Doc. No. 45 at 7–8.) That

17

tactic was especially bold, as Hudson would not reasonably have known to specifically explore that issue in discovery given Conrail's prior averments about the policy. (*See* Doc. No. 52 at 10 n.7.) In other words, both Hudson and the Court should be able to rely on Conrail's uncorrected averments certified under Rule 11 and incorporated into the Case Management Order about what forms the "true and correct" content of the contract at issue.

Finally, estoppel is appropriately tailored to these facts. As one court has put it, the "general rule" is that "parties are bound by their initial pleadings" insofar as matters are admitted, for courts cannot "permit a party in its pleadings to get away with being a prevaricating chameleon." *Homel v. Sun Ins. Office, Ltd.*, No. 92-cv-0442, 1993 WL 56028, at *4 (E.D. Pa. Feb. 27, 1993). Otherwise, the court explained, the party "would visit an injustice on the other party, and make such a mockery of the sanctity of judicial pleadings, rendering meaningless the letter and spirit of Rule 11." *Id.* Without estoppel here, Conrail would profit from its own failure to correct its averments and from what undoubtedly became knowing misrepresentations to the Court about what it believed to be the true content of the policy.

The facts of *Homel* further illustrate why estoppel is appropriate. In that case, the plaintiffs sought a declaration that an insurance policy provided excess coverage after an automobile accident. *Id.* at *2. But at the time of the accident, the policy did not actually provide for excess liability coverage. *Id.* In claiming otherwise in their eventual suit against the defendant insurer, the plaintiffs relied on documents that the defendant "mistakenly attached to its complaint in a prior declaratory judgment action" including a "broker commission statement and a contract guide which were not part of the policy issued." *Id.* But because the defendant erroneously appended the documents "in good faith," the court granted the defendant's request to amend the complaint "to include a correct copy of the insurance policy." *Id.*

Nevertheless, in the subsequent action, the plaintiff argued that the defendant was estopped from denying excess coverage "by reason of the attachments to the complaint in the prior declaratory judgment action." *Id.* at *4. In rejecting that claim, the court reasoned that the defendant mistakenly attached the documents to the complaint in the prior action, had corrected that mistake, and that deciding the case on "an obvious untruth" would "not serve the cause of justice." *Id.* at *4.

This case is far different. Unlike in *Homel*, Conrail never sought to amend the Complaint to establish that any mistake in its averments about the policy was in good faith or to fix its prior assertion about the true content of the policy because it was obviously untrue. Instead, Conrail did nothing, hoping to score victory by surprise on summary judgment. Such sharp practice is inexcusable here, particularly from a sophisticated company that is no stranger to this Court. After all, a party's representations to the Court and its certification consistent with Rule 11 must mean something. If the result is harsh, the fault is Conrail's alone. It simply cannot now shirk the suit limitation clause.[7]

## IV. CONCLUSION

For the foregoing reasons, Hudson's motion for summary judgment is **GRANTED**, and Conrail's cross-motion for summary judgment is **DENIED**. Conrail's separate motion for summary judgment on the law and ordinance issue is **DENIED AS MOOT** insofar as it asserts

---

[7] Conrail had an opportunity to address Hudson's argument that it should not be permitted to claim that it never agreed to the suit limitation clause because Conrail attached a copy of the policy to the Complaint containing the clause and alleged that the policy was "true and correct." (Doc. No. 41 at 8–11.) In its sur-reply addressing the issue, Conrail argued that it should not be accountable for its assertions in the Complaint because Conrail attached the documents "before discovery" proceeded and "fully demonstrated Hudson's pattern and practice of including new policy wording after the parties had reached agreement on the terms of the contract." (Doc. No. 45 at 10.) That, however, does not answer for why Conrail never corrected its assertions in the Complaint and as adopted in the Case Management Order.

claims against Hudson.  Hudson's motion for leave to file a sur-reply in connection with Conrail's law and ordinance motion (Doc. No. 61) is also **DENIED AS MOOT**.  An Order shall issue.

Dated: 6/10/2019                                                          /s/ Robert B. Kugler
                                                                                      ROBERT B. KUGLER
                                                                                      United States District Judge