## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| CONSOLIDATED RAIL CORPORATION, | : | |
| | : | |
| Plaintiff, | : | Civil No. 17-12281 (RBK/KMW) |
| v. | : | |
| | : | **OPINION** |
| ASPEN SPECIALTY INSURANCE | : | |
| COMPANY, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**KUGLER**, United States District Judge:

This matter comes before the Court on the summary judgment motion (Doc. No. 31) of Plaintiff Consolidated Rail Corporation ("Conrail") and the cross-motion for summary judgment (Doc. No. 59) of Defendants Aspen Specialty Insurance Company and Landmark American Insurance Company.[1]  For the reasons below, Defendants' motion is **GRANTED**, and Conrail's motion is **DENIED**.

## I.    BACKGROUND[2]

This case concerns whether insurers Aspen and Landmark are required to pay for the costs that Conrail—a rail service provider for freight shipments—incurred in rebuilding a bridge that spans a creek in Paulsboro, New Jersey.  The bridge sustained damage following a train

---

[1] Although both motions also involve claims by and against a third insurer in this case, Hudson Specialty Insurance Company, the Court held that those claims were moot when it granted Hudson's motion for summary judgment on a separate issue in this case.  (Doc. Nos. 64, 65.) Accordingly, the Court need not discuss the issues related to Hudson in addressing the motions in this Opinion.

[2] In addition to the relevant record evidence, the facts are drawn from the parties' Statements of Material Facts ("SMF") where the parties do not dispute the facts asserted.  *See* L. Civ. R. 56.1(a).  Disputed facts are noted accordingly.

derailment in November 2012 and to repair it, Conrail converted the bridge from a movable "swing bridge" to a movable "lift bridge," a change that Conrail contends the law required.

## A. Insurance Policies

This case implicates several terms in the parties' insurance contracts. Aspen and Landmark sold Conrail "all risks" insurance policies that insured Conrail against property damage between June 1, 2012, and June 1, 2013. (Doc. No. 32 ("Pl.'s SMF") at ¶¶ 1, 5.) Both policies provide a limit of $6 million as part of a $30 million quota share that attaches excess of the primary policy. (*Id.* at ¶¶ 2, 6.) The policies each insure against all risks of "direct physical loss, damage or expenses to covered property, including claim adjustment and subrogation expenses, as may be further extended, limited, or defined elsewhere" in the policies. (Doc. No. 1-1 at 15, ¶ 4; Doc. No. 1-3 at 13, ¶ 4.)

The policies extended Conrail's all risks insurance to "contingent liability from operation of any law or order governing the demolition, repair, or replacement of insured property damaged by an insured peril." (Doc. No. 1-1 at 22, ¶ 2A(2)(i); Doc. No. 1-3 at 20, ¶ 2A(2)(i).) Importantly, "contingent liability from operation of law governing the demolition, repair or replacement of insured property" as used in the policies means:

> This policy shall cover consequential expenses or losses resulting from the enforcement of laws or ordinances which do not permit restoration of structures to their condition prior to the damage caused by a peril insured against. These expenses shall include the loss of value of the undamaged portion of the structure, cost of demolition of the undamaged portion of the structure, and increased expense to replace the structure with one conforming to laws or ordinances or to repair the damaged structure so that it meets current building laws or ordinances.

(Doc. No. 1-1 at 15, ¶ 3(D); Doc. No. 1-3 at 13, ¶ 3(D).) The policies also provide that "[i]n the event of loss or damage under this policy that results in the enforcement of any law or ordinance regulating the construction or repair of damaged facilities, including the demolition of the

undamaged portions of the facilities," Defendants "shall be liable for . . . the increased cost of repair or reconstruction of the damaged and undamaged facility on the same or another site and limited to the minimum requirements of such law or ordinance regulating the repair or reconstruction of the damaged property on the same site."  (Doc. No. 1-1 at 26, ¶ 2A(4)(i)(iii); Doc. No. 1-3 at 24, ¶ 2A(4)(i)(iii).)

### B.  Train Derailment

On November 30, 2012, a train derailed while crossing a bridge that spanned Mantua Creek in Paulsboro, New Jersey and damaged the bridge.  (Pl.'s SMF at ¶ 12.)  Conrail owns and operates the bridge, which was built in the 1900s, and is partially moveable.  (Doc. No. 57-1 ("Defs.' SMF") at ¶¶ 1, 25.)  Specifically, it contains a part that is designed to "swing like a door" to allow the Creek's marine traffic to pass through.  (*Id.* at ¶ 1.)  The derailment, however, left the swing bridge's movable element inoperable.  (Pl.'s SMF at ¶ 14.)

Repair efforts followed, though not without issue.  To restore railroad traffic, Conrail fixed the bridge in place.  (*Id.* at ¶ 15.)  But this repair made the draw of the swing bridge inoperable and prevented most marine traffic from passing through.  (*Id.* at ¶ 17.)  In this condition, with the bridge's low steel not movable and sitting slightly above the Creek's mean high-water elevation, the swing bridge did not comply with federal law requiring that it remain in the open position from March through November, and that it open with four hours' notice from December through February.  (*Id.* at ¶¶ 16, 18.)

### C.  Communications with Modjeski & Masters and Coast Guard

Conrail retained engineers Modjeski & Masters ("M&M") in early December 2012 to assist with the bridge repair.  (Defs.' SMF at ¶ 12.)  On December 17, 2012, Conrail instructed M&M to provide a "proposal to install a permanent movable bridge over the Mantua Creek."

(*Id.* at ¶ 13.)  M&M considered different types of bridges, including a vertical lift bridge which was eventually chosen.  (*Id.* at ¶¶ 14, 16.)  By December 19, 2012, M&M sent Conrail a conceptual design of a new lift bridge to replace the existing swing bridge.  (*Id.* at ¶ 16.)

Conrail also began corresponding with the Coast Guard, the agency responsible for approving certain bridge work across waters of the United States.[3]  On January 29, 2013, Conrail advised the Coast Guard that Conrail intended to design and construct a new draw span and had already taken steps toward that end.  (*Id.* at ¶ 19.)  Conrail requested that the Coast Guard allow the draw of the bridge to remain closed to the passage of marine vessels until September 2014 to account for the time needed to design, obtain approval for, construct, and put into operation a new draw span for the bridge.  (Pl.'s SMF at ¶ 20.)

In the meantime, Conrail continued planning with M&M.  On January 31, 2013, M&M sent Conrail a "technical priced proposal" and summarized its understanding of "key issues driving" the bridge reconstruction project.  (Doc. No. 57-10 at 2–5.)  Among other things, M&M noted that such issues included that the Coast Guard would require Conrail to provide a 25-foot minimum vertical under-clearance, that Conrail was "interested in determining the feasibility of raising the low steel elevation of the bridge superstructure to an elevation that is above the 100-year flood elevation," and that "repurposing another movable bridge to this site is not in the plan, and a new movable bridge like that of the existing bridge is not an option."  (*Id.* at 4.)

Thereafter, M&M communicated about its early stage efforts for the development project.  On March 8, 2018, for example, M&M sent Conrail a "pro & con" comparison from its "early stage" considerations between a vertical lift bridge and another type of bridge—but the document did not discuss rebuilding the swing bridge as it existed before the derailment.  (Doc.

---

[3]  "The authority of the Coast Guard to issue bridge permits derives from the General Bridge Act of 1946."  *State of Delaware v. Bender*, 402 F. Supp. 1066, 1070 (D. Del. 1975).

No. 57-11 at 1–4.) M&M suggested that the vertical lift bridge "offer[ed] the best overall project solution when cost, serviceability, reliability, installation and rail operations are considered." (*Id.* at 4.) On March 28, 2013, M&M provided Conrail with a "list of reasons why the existing swing span should be replaced with a new vertical lift" based on its "early stage" efforts and its "initial[] assess[ment]." (Doc. No. 57-12 at 1, 2.) Although M&M stated that it considered "the virtues of rehabilitating the existing swing span," it concluded that a vertical lift bridge offered several advantages over the old swing design, but did not list compliance with laws or ordinances among the early reasons. (*Id.* at 2–3.)

In March of 2013, Conrail heard back from the Coast Guard about its intention to design and construct a new bridge span. Specifically, on March 13, 2013, the Coast Guard reminded Conrail of its responsibility to operate, maintain, and repair the bridge "in accordance with the applicable statutes and regulations" and stated that in its fixed position, the bridge created "an unreasonable obstruction and hazard to navigation" and thus violated 33 U.S.C. § 494—Obstruction of navigation. (Doc. No. 31-7 at 2.) Under the threat of civil penalty, the Coast Guard ordered Conrail to take several step, including submitting preliminary "plans for a replacement drawbridge" within ninety days; submitting definitive engineering plans and a timetable for a "replacement drawbridge" within six months; and commencing construction on a "new drawbridge" within one year of receipt of the letter. (*Id.*) The Coast Guard's Office of Bridge Programs defines the term "drawbridge" to include six different types, including "swing" drawspans that "open[] by rotating horizontally on a central axis." (Defs.' SMF at ¶ 38.) The Coast Guard also enclosed a copy of its Bridge Permit Application Guide. (Doc. No. 31-7 at 2.)

In late March 2013, Conrail began finalizing its proposal. On March 29, 2013, Conrail requested that M&M prepare a "final official proposal for design" that Conrail intended to

submit to its Board of Directors. (Defs.' SMF at ¶¶ 23–24.) In April 2013, Conrail gave M&M a notice to proceed with the lift bridge, and they did. (*Id.*)

**D. Executive Order 11988 and Bridge Permit Guide**

The crux of the parties' current dispute implicates what repairs the law and Coast Guard required Conrail to make. One of the documents relevant to that issue is the Coast Guard's Bridge Permit Guide enclosed in the Coast Guard's March 13 letter to Conrail. (Doc. No. 31-8.)

The Bridge Permit Guide is intended to assist agencies and members of the public when applying for a Coast Guard permit to "construct a new bridge or causeway or reconstruct or modify an existing bridge or causeway across the navigable waters of the United States." (*Id.* at 4.) By its own terms, however, the Bridge Permit Guide's "guidance is not a substitute for applicable legal requirements, nor is itself a rule." (*Id.* at 10.) The Bridge Permit Guide further states that it is neither "intended nor does it impose legally-binding requirements on any party," although it "may assist . . . the Coast Guard . . . in applying statutory and regulatory requirements." (*Id.* at 10.) Indeed, the bridge permitting process is "directed by laws, policies, professional standards, and other requirements." (*Id.* at 12.)

The Bridge Permit Guide mentions several laws, including Executive Order 11988. (*Id.* at 34.) President Carter enacted Executive Order 11988 in 1977 "to avoid to the extent possible the long and short term adverse impacts associated with the occupancy and modification of floodplains and to avoid direct or indirect support of floodplain development wherever there is a practicable alternative." (Doc. No. 31-9 at 2.) Executive Order 11988 states that agencies "shall take action to reduce the risk of flood loss, to minimize the impact of floods on human safety, health and welfare, and to restore and preserve the natural and beneficial values served by floodplains." (*Id.*)

Relevant here, Executive Order 11988 states that if an agency has determined or proposed to conduct, support, or allow an action to be in a floodplain, "the agency shall consider alternatives to avoid adverse effects and incompatible development in the floodplains." (*Id.* at 3.) If the agency head finds that "the only practicable alternative consistent with the law and with the policy set forth in this Order requires sitting in a floodplain, the agency shall, prior to taking action . . . design or modify its action in order to minimize potential harm to or within the floodplain." (*Id.*)

According to the Floodplain Management Guidelines from 1978 that implement Executive Order 11988, "[m]inimize is a demanding standard and requires the agency to reduce harm to the smallest possible degree;" the Guidelines further state that "[t]he Order's requirement to minimize potential harm" to or within the floodplain "applies to (1) the investment at risk, or the flood loss potential of the action itself, (2) the impact the action may have on others, and (3) the impact the action may have on floodplain values." (Doc. No. at 31-13 at 38.) The Guidelines also speak of reducing harm to or within the floodplain with respect to "lives and property." (*Id.*)[4]

In discussing Executive Order 11988, the Bridge Permit Guide states that Executive Order 11988 "requires federal agencies to avoid authorizing projects in the base floodplain unless there is no practical alternative." (Doc. No. 31-8 at 34.) It also notes that "[b]y their very nature, most bridges are located within the base floodplain." (*Id.*) "Therefore," it states, "the

---

[4] In more recent Guidelines cited by Defendants and issued on October 8, 2015 (after Conrail received its bridge permit), the Guidelines state that minimizing harm refers "to both lives and property" and repeats that minimizing harm applies to the investment at risk or the flood loss potential of the action itself, the impact the action may have on others, and the impact the action may have on floodplain values. (Doc. No. 57-19 at 74–75.)

Coast Guard must ensure that the project design includes all measures practicable to minimize floodplain impacts and to protect the natural and beneficial values of the floodplain." (*Id.*)

### E. Bridge Alternatives

In considering submissions for bridge permits, the Coast Guard required in the Bridge Permit Guide that applicants submit documentation identifying, among other things, the "alternatives for the proposed project," which "should be more than just build and no build." (Doc. No. 31-8 at 32.) M&M conducted an analysis of alternatives for the bridge project and Conrail submitted the alternatives analysis to the Coast Guard in Conrail's eventual permit application. (Pl.'s SMF at ¶¶ 30, 52.)

M&M's alternative analysis evaluated three possibilities: (1) a no build/do nothing alternative; (2) a rehabilitation alternative; and (3) a replacement alternative. (*Id.* at ¶ 30.) The rehabilitation option, which would have repaired the bridge to its pre-derailment state, cost $4,686,311. (*Id.* at ¶ 34.) The replacement alternative, which would change the swing bridge to a vertical lift bridge, cost $13,974,639. (*Id.* at ¶ 57.) Replacing the swing bridge with a lift bridge entailed replacing the movable portion of the existing, damaged swing bridge structure and inoperable span with a new tower span that could lift vertically above Mantua Creek. (*Id.* at ¶ 42.)

M&M rejected the first two alternatives. M&M concluded that the do nothing alternative was not viable because the bridge, in its inoperable and damaged condition, would not restore marine traffic as the Coast Guard directed. (Doc. No. 31-10 at 3.) Nor did M&M recommend the rehabilitation alternative, as repairing the swing design to its pre-derailment form would be lengthier than other alternatives and cause business disruption due to damage and stress to parts of the bridge. (*Id.* at 3–4.) M&M also opined that continuing to use a swing design would fail to

reduce safety concerns that another train could derail and presented "an ongoing maintenance and safety issue" due to the characteristics of the swing design that made it susceptible to debris buildup during high tide conditions and damage associated with flood levels and inundation. (*Id.*)

M&M further concluded that rehabilitation would cause "floodplain impacts." (*Id.* at 4.) According to M&M, because of river flow, tides, a flood study, and the elevation of the swing bridge's low steel, which sat slightly above the mean high water elevation, rehabilitating the swing bridge would "act as an obstruction to the floodplain for any tidal flood levels more than .022 feet in excess of the mean high water elevation," and would thus fail to "minimize floodplain impacts or protect the natural and beneficial values of the floodplain to the extent practicable." (*Id.*)

Another engineer at the engineering firm of Madsen, Kneppers & Associates, John O'Leary, discussed rebuilding the swing bridge. In his opinion, "[r]eplacement of the swing span on the bridge with an in kind span would not provide any additional obstruction to the flow of Mantua Creek, when compared with the configuration prior to derailment." (Doc. No. 57-21 at 2.) He also noted that the Coast Guard had provided no correspondence stating that Conrail could not replace the damaged swing bridge span with an in kind span. (*Id.*) Mr. O'Leary opined further that after Executive Order 11988 was signed in 1977, Conrail performed "significant alterations" to the bridge in 1980 and 2009—the latter after a train derailment— without needing to change the swing bridge's design under the law. (*Id.* at 3-5; *see also* Doc. No. 57-34 at 3–4.) Conrail, by contrast, characterized the work in 1980 and 2009 as routine maintenance that did not require Coast Guard approval. (Doc. No. 60-1 ("Pl.'s Resp. to Defs.' SMF") at ¶¶ 41–43.) A different engineer also noted that the tidal range is "believed to have

changed with high tides submersing the lower portions of the spans and flood tides nearly completely submerging" the swing bridge. (Pl.'s SMF at ¶ 41.)

Ultimately, M&M suggested that the best bridge design for the project was the lift bridge design and noted in the alternatives analysis that it compared favorably to rehabilitating the swing design. (Doc. No. 31-10 at 5–7.) M&M noted that because the low steel on the proposed vertical lift bridge would be several feet higher than the low steel on a rehabilitated swing bridge, a replacement vertical lift bridge would "better accommodate tidal flood levels in excess of the mean high water elevation." (*Id.* at 5.) M&M further noted that replacing the swing bridge with a lift bridge would "result in positive benefit to the flood characteristics of Mantua Creek" because the relocated substructure units on the lift bridge would be located in shallower water depths. (*Id.*) Moreover, M&M stated that the higher structure of the lift bridge would "provide more operational flexibility to accommodate higher floods and higher tides." (*Id.*) M&M continued to list the other benefits of using a lift bridge with respect to railway safety, maintenance, and business disruption. (*Id.* at 5–7.) M&M concluded the analysis by stating that the replacement alternative "was the only alternative to incorporate all measures practicable to minimize impacts to the floodplain," and "is the required alternative pursuant to Executive Order 11988, which mandates that federal agencies minimize potential harm presented by projects within the floodplain." (*Id.* at 7.)

### F.  Coast Guard Permit

In November 2013, Conrail submitted its formal application to the Coast Guard to replace the inoperable swing bridge with a vertical lift bridge. (Pl.'s SMF at ¶ 51.) As noted, Conrail's permit application attached M&M's alternatives analysis. (*Id.* at ¶ 52.) A public notice seeking comments on Conrail's proposal followed, and the notice informed the public that Conrail

"propose[d] to replace the existing fixed span structure with a new tower span vertical-lift drawbridge." (Doc. No. 31-17 at 2.) After issuing the notice for public comment on Conrail's vertical lift bridge proposal, the Coast Guard issued Conrail a permit to construct a vertical lift bridge on April 24, 2014. (Pl.'s SMF at ¶¶ 53–54.) Conrail completed construction on the new lift bridge in March 2016. (*Id.* at ¶ 56.)

### G. Procedural History

After Conrail finished bridge reconstruction, it provided its insurers with its final proof of loss in December 2016. (*Id.* at ¶ 57.) It cost Conrail $9,288,328 more to build the new lift bridge than to rehabilitate the swing bridge to its original form. (*Id.*) Conrail claimed that when combined with other expenses, its total losses for the project exceeded its insurers' $15 million attachment point. (*Id.*)

Conrail then settled its claim with its primary insurer, but Hudson, Aspen, and Landmark denied Conrail's claim. (*Id.* at ¶ 60.) On November 30, 2017, Conrail sued Aspen, Hudson, and Landmark in this Court. (*Id.* at ¶ 61.) Thereafter, the Court granted Hudson's motion for summary judgment based on a suit limitation clause in the parties' insurance contract and found that Conrail could not pursue its time-barred claims against Hudson. (Doc. Nos. 64, 65.)

Conrail, Aspen, and Landmark now move for summary judgment. Based on language in the insurance policies, Conrail seeks "a declaration that the 'law or ordinance' coverage under the Insurers' excess first-party property policies . . . protects it for the additional cost that Conrail was required to incur to rebuild the damaged bridge in compliance with federal environmental laws governing floodplain management and protection." (Doc. No. 31 ("Pl.'s Br.") at 1.) In other words, Conrail requests a judgment that would require Defendants "to accept as covered loss the full $13,974,639 cost of the Lift Bridge design and to pay that portion of Conrail's total

property losses that exceeds their $15 million underlying policy limits." (*Id.* at 17–18.) Defendants have opposed the motion and cross-moved for summary judgment "seek[ing] a declaration that they are not obligated, under the property insurance policies at issue, to pay for replacement of the Swing Bridge with the Lift Bridge." (Doc. No. 58-1 ("Defs.' Br.") at 5.)

## II.   LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Id.* The movant bears the burden of showing the absence of a "genuine issue of material fact." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). The party may satisfy its burden by "produc[ing] evidence showing the absence of a genuine issue of material fact" or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

If the movant makes this showing, the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmovant must "point to concrete evidence in the record that supports each and every essential element of his case." *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995). "When opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d

226, 233 (3d Cir. 2002)).  The Court's role is not to weigh the evidence and decide the truth, but to determine if there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In making that decision, "[a]ll facts and inferences are construed in the light most favorable to the non-moving party," *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998), and credibility determinations are for the fact finder.  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.    DISCUSSION

The primary issue here is the interpretation of the "law and ordinance" provisions in the parties' insurance policies, which require that Defendants cover "consequential expenses or losses resulting from the enforcement of laws or ordinances which do not permit restoration of structures to their condition prior to the damage caused by a peril insured against."  (Doc. No. 1-1 at 15, ¶ 3(D); Doc. No. 1-3 at 13, ¶ 3(D).)  The policies also cover loss or damage that "results in the enforcement of any law or ordinance regulating the construction or repair of damaged facilities," including "the increased cost of repair or reconstruction of the damaged and undamaged facility . . . limited to the minimum requirements of such law or ordinance regulating the repair or reconstruction of the damaged property on the same site."  (Doc. No. 1-1 at 26, ¶ 2A(4)(i)(iii); Doc. No. 1-3 at 24, ¶ 2A(4)(i)(iii).)

At summary judgment, the Court construes these contract provisions as a matter of law. *See Milk Indus. Mgmt. Corp. v. Travelers Indem. Co. of Am.*, 337 F. Supp. 3d 423, 429 (D.N.J. 2018) (noting that interpretation of an insurance construction is question of law).  The same goes for any applicable "laws" or "ordinances" that the contract provisions implicate.  *See, e.g., City of Morgan Hill v. Bay Area Air Quality Mgmt. Dist.*, 13 Cal. Rptr. 3d 420, 431 (Cal. Ct. App. 2004) ("The construction of an executive order presents an issue akin to an issue of statutory

interpretation—one that presumably presents a question of law for our independent review on appeal.").

Based on the relevant contract language and the requirements of the "laws" at issue, Conrail and Defendants each assert various reasons why they believe they are entitled to summary judgment and the other is not. But it is the central issue that resolves this case in favor of the insurers: Conrail has not shown that any law or ordinance required it to convert the swing bridge into a vertical lift bridge.

### A. Laws or Ordinances

The Court begins with identifying the potentially applicable "laws" or "ordinances" in this case and finds that Executive Order 11988—which President Carter enacted in 1977 to deal with floodplain management—is the only "law" or "ordinance" that could be "enforced" against Conrail to trigger its coverage under the policies.

As the Third Circuit has noted, there is "no doubt" that "executive orders and regulations have the force of law." *Farmer v. Philadelphia Elec. Co.*, 329 F.2d 3, 8 (3d Cir. 1964). Courts in this district have easily concluded the same. *See Mele v. U.S. Dep't of Justice*, 395 F. Supp. 592, 597 (D.N.J. 1975) ("It is well established that Executive Orders have the force and effect of law."); *Joyce v. McCrane*, 320 F. Supp. 1284, 1290 (D.N.J. 1970) ("The validity of the Executive orders cannot be assailed. They have the force and effect of law."). Defendants do not contend that Executive Order 11988 lacks the force of law such that it could not be a "law" within the meaning of the parties' contract provisions. Thus, the Court need not find otherwise.[5]

---

[5] The Court notes, however, that at least one other court has held—in different context—that Executive Order 11988 "does not have the force and effect of law" and is no more "than a managerial tool for implementing the President's personal policies." *See Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*, 176 F. Supp. 3d 839, 847–48 (D. Minn. 2016). In *Richland*, the district court considered whether it could review a claim that the United

The Coast Guard's communications and documents, by contrast, are not "laws" or "ordinances." By its own terms, the Coast Guard's Bridge Permit Guide is not "itself a rule." (Doc. No. 31-8 at 10.) Nor "does it impose legally-binding requirements on any party." (*Id.*) At most, the Bridge Permit Guide "may assist . . . the Coast Guard . . . in applying statutory and regulatory requirements" that direct the bridge permitting process. (Doc. No. 31-8 at 10, 12.) Likewise, the Coast Guard's March 13, 2013 letter communication with Conrail about bridge construction is not a "law" or "ordinance." It is simply a letter. And letters are not laws. Even letters containing an agency's interpretation of a matter—which is far more than the Coast Guard's letter here—"lack the force of law." *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000). Thus, Executive Order 11988 is the only "law" at issue in deciding whether Conrail can recover under the parties' "law and ordinance" contract provisions.

## B. Enforcement and Requirements of Applicable Laws or Ordinances

Given that Executive Order 11988 is the only "law" potentially applicable here, the Court next considers what it means for it to be "enforced" against Conrail, as the insurance policies require before Conrail can obtain coverage. Conrail contends that an "affirmative enforcement

---

States Army Corps of Engineers violated Executive order 11988 in undertaking a flood diversion project. *Id.* In doing so, the district court explained that "[m]ost executive orders" are "not judicially enforceable in private civil suits" unless the executive order possesses a "specific foundation in congressional action" and "the force and effect of law." *Id.* In finding that it could not review whether the government's action violated the Executive Order because Executive Order 11988 lacked the force of law, the court reasoned that "[w]hen President Carter promulgated the order, he did so under authority vested in him by the Constitution and unspecified 'statutes,'" but never "specif[ied] what exact laws the order was meant to enforce." *Id.* The court also reasoned that although the Executive Order states that its provisions are "in furtherance" of certain flood-related federal statutes, "the executive order does not suggest its provisions are coextensive with any of those statutes." *Id.* This case, however, does not involve the Court's ability to review the government's actions to determine if it violated Executive Order 11988. And absent argument from Defendants, the Court need not decide whether it could extend the *Richard*'s reasoning to this different context to conclude that Executive Order 11988 is not a "law" within the meaning of the parties' "law" or "ordinance" contract provisions.

action" is not required before a party may seek to recover under a "law or ordinance" contract clause, and instead, "an enforceable legal requirement suffices to trigger that coverage." (Pl.'s Br. at 12–14.) By "affirmative enforcement action," Conrail apparently means a formal decision by an authority rejecting its proposal based on the requirements of an applicable "law" or "ordinance." (*Id.* at 13–14.) Defendants, by contrast, imply that an affirmative action is required in stating that "Conrail goes to great lengths in its moving brief to argue that 'enforcement' does not require an affirmative action on the part of a governmental body or agency to trigger the law and ordinance coverage." (Defs.' Br. at 17.)[6]

Although on its face, the term "enforcement" as used in the provisions could suggest that an affirmative enforcement action by a relevant authority is required before Conrail may recover, a court in this Circuit recently "favor[ed] a broad reading of the term 'enforcement'" and explained that "in this Circuit, it appears that for enforcement of a building ordinance to have effect under the Policy, it is enough that the ordinance mandate changes without an official taking any specific action." *Windowizards, Inc. v. Charter Oak Fire Ins. Co.*, No. 13-cv-7444, 2015 WL 1400726, at *5 (E.D. Pa. Mar. 27, 2015).

The court in *Windowizards* based this conclusion on the Third Circuit's decision in *Regents of Mercersburg College*, 458 F.3d 159, 162 (3d Cir. 2006). In that case, a fire damaged the insured's building. *Id.* The insured sought coverage under an insurance policy that covered losses "caused by enforcement of any ordinance or law that . . . requires demolition of parts of the same property." *Id.* In ruling on the insured's claim to recovery the money it spent repairing

---

[6] Defendants also suggest that "New Jersey law requires Conrail to bear the burden of establishing that [M&M] enforced Executive Order 11988 and mandated the use of the new 'lift' bridge design" in order to obtain coverage under the "law and ordinance" clauses at issue here. (*Id.* at 17–18.) But this is not the inquiry, for engineers do not "enforce" laws. But according to Conrail, "the Coast Guard did," an issue discussed below. (Doc. No. 60 ("Pl.'s Rep. Br.") at 3 n.7.)

the building in compliance with the Americans with Disabilities Act and other building codes, the Third Circuit held that the insurer was liable for repairs that "were mandated by the ADA." *Id.* at 170. As the court in *Windowizards* observed, however, the Third Circuit "did not require an official to enforce the law by issuing a citation—all that it required was evidence that the renovation or modification was necessary under the law." *Windowizards, Inc.*, 2015 WL 1400726, at *5 (citing *Regents of Mercersburg Coll.*, 458 F.3d at 172).[7]

Even if a formal, affirmative rejection of Conrail's proposal is not required before Conrail may attempt to recover under the policy, these cases demonstrate that courts construing "law and ordinance" provisions require that "the renovation or modification was *necessary* under the law" and that it "*mandate* changes." *Windowizards, Inc.*, 2015 WL 1400726, at *5 (emphasis added); *see also Regents of Mercersburg Coll.*, 458 F.3d at 170 ("Of course, any alterations, renovations and/or improvements made to any floor of Keil Hall that were not *mandated by* the ADA (*i.e.*, discretionary alterations) do not fall within the scope of coverage of the Endorsement, and, as a result, do not obligate the insurer." (emphasis added)). Conrail does not dispute the necessity of this inquiry. (*See, e.g.*, Pl.'s Br. at 14.)

Thus, the Court must consider what Executive Order 11988 required of Conrail. Executive Order 11988 "is focused exclusively on preventing unnecessary development in floodplains and limiting the harmful effects of actions that must be sited in floodplains." *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 849 (9th Cir. 2013). Under Executive

---

[7] *See also Bischel v. Fire Ins. Exch.*, 1 Cal. App. 4th 1168, 1177 (1991) (stating that "enforcement of a law" need not "include affirmative action of some sort" and that "[i]mplementing building standards and withholding permits for construction in violation of those standards is how the city" enforces municipal code provisions); *State Farm Fire & Cas. Co. v. Metro. Dade Cty.*, 639 So. 2d 63, 66 (Fla. Dist. Ct. App. 1994) ("Whether the homeowners comply with codes and ordinances before or after the County takes action is irrelevant. The threat of enforcement is the driving force behind compliance with building and construction codes and ordinances.").

Order 11988, "[a]gencies must avoid siting actions in floodplains unless the head of the agency finds there is no practicable alternative." *Id.* at 851 (citing 42 Fed. Reg. 26951 § 2(a)(2) (1977)). If there is no practicable alternative, the agency must "(i) design or modify its action in order to minimize potential harm to or within the flood plain," and "(ii) prepare and circulate a notice containing an explanation of why the action is proposed to be located in the flood plain." *Id.* at 851–52.

Here, the parties' dispute whether Executive Order 11988 required Conrail to change the bridge's swing design to a vertical lift design in order to minimize harm to the floodplain. According to Conrail, "[m]erely rebuilding the bridge to its original configuration would have violated the requirement of federal law that all bridges be constructed to 'minimize' their impact on the floodplain," and "[t]o comply with that requirement, [Conrail] had to replace the old bridge with a different, more costly one." (Pl.'s Br. at 1.) Defendants, of course, disagree, contending that Conrail "did not need to change the design of the bridge in order to comply with Executive Order 11988 because the pre-derailment bridge did not cause harm to the floodplain, and the new bridge design did nothing to minimize floodplain harm." (Defs.' Br. at 30; *see also id.* at 19–25.)

The Court finds that Executive Order 11988 did not require Conrail to change the swing bridge design in favor of a new lift bridge design. As Defendants note, the text of Executive Order 11988 does not require Conrail to do anything in terms of replacing or rebuilding a bridge. (Defs.' Br. at 22.) In fact, it specifically refers to what *agencies* must do. And Conrail is not an agency.

Without any specific wording that required Conrail to change the swing bridge to any other bridge, Executive Order 11988 is unlike the laws or ordinances in the cases on which

Conrail relies. In those cases, the laws or ordinances specifically required the plaintiff to make the challenged repairs. The portion of the ADA at issue in *Regents of Mercersburg*, for example, specifically required that any alterations to the facility be "readily accessible to and usable by individuals with disabilities" and further required the entity undertaking the alteration to leave the path of travel to the bathrooms, telephones, and drinking fountains in the area readily accessible to individuals with disabilities. 458 F.3d at 165 (citing 42 U.S.C. § 12183(a)). The ADA is also accompanied by very specific regulations that explain, among other things, what constitutes a covered "alteration." *See id.* (citing 28 C.F.R. § 36.402(b)(1) ("Alterations include, but are not limited to, remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions.")). The other cases that Conrail cites involve similarly specific laws or ordinances.[8]

Because Executive Order 11988 required nothing of Conrail, Conrail is resigned to argue that Executive Order 11988 required it to change bridge designs because the Coast Guard—as the agency responsible for authorizing the construction—would "deny a permit for proposed bridge construction in a floodplain if that proposal fails to take all practicable measures to minimize impact on that floodplain." (Pl.'s Br. at 15–17; *see also* Pl.'s Rep. Br. at 3, 5.) In other words, Conrail suggests that it had to change the bridge's design to a lift bridge because it was

---

[8] *E.g.*, *Windowizards, Inc.*, 2015 WL 1400726, at *3 (assessing upgrades "mandated by building ordinances"); *State Farm Fire & Cas. Co.*, 639 So. 2d at 64 (examining "South Florida Building Code" that "requir[ed] many homeowners to make structural improvements to their houses to bring them into compliance" and requiring homeowners to "elevate the houses to conform to the County's Flood Elevation Requirements"); *Brandywine Flowers, Inc. v. W. Am. Ins. Co.*, No. 92C-04-196, 1993 WL 133176, at *2 (Del. Super. Ct. Apr. 19, 1993) (examining zoning and land use laws that "strictly limit[] the ability of a landowner to alter, extend or rebuild a structure devoted to a nonconforming use" and noting the process for "obtain[ing] variances and building permits").

the only option that the Coast Guard would approve consistent with the enforceable legal requirements of Executive Order 11988.

But Conrail identifies no communication from the Coast Guard in which the Coast Guard suggested that Conrail would be precluded from rebuilding the swing bridge because it caused harm to the floodplain within the meaning of Executive Order 11988. In fact, even viewed in the light most favorable to Conrail, the communications from the Coast Guard suggest the opposite. In its March 13, 2013 letter, for example, the Coast Guard ordered Conrail to submit plans to replace the structure's "drawbridge," and the Coast Guard's own definition of the term "drawbridge" includes a swing design that rotates horizontally to bring it in line with the channel. (Defs.' SMF at ¶ 38.) The Coast Guard's use of the term "drawbridge" and its specific definition suggests that the Coast Guard would not have prevented Conrail from repairing the pre-derailment swing design on the ground that it harmed the floodplain.

The letter's other aspects support the same conclusion. The letter, sent to Conrail when the bridge was fixed in place but still in its pre-derailment configuration did not mention Executive Order 11988 or that the pre-derailment configuration would violate it. (Doc. No. 31-7 at 2.) Instead, it simply indicated that the Coast Guard "determined that the current bridge's reconfiguration after the accident as a low-level fixed-span bridge is negatively impacting mariners and is an unreasonable obstruction and hazard to navigation" in violation of 33 U.S.C. § 494. (*Id.*) Again, the Coast Guard's concern with the inoperable bridge's impact on navigation fails to suggest that the Coast Guard was concerned that the swing design caused harm to the floodplain within the meaning of Executive Order 11988.

The Coast Guard's ultimate approval of the new vertical lift design does not change this conclusion. Although Conrail submitted M&M's "alternatives analysis" to the Coast Guard as

the Coast Guard's Bridge Permit Guide required, and that analysis discussed but did not recommend rebuilding the swing bridge, the Coast Guard's mere acceptance of the lift design does not demonstrate that the swing design would have failed to meet the minimum requirements of Executive Order 11988 to minimize harm to the floodplain. This is particularly true in light of the Coast Guard's other communications suggesting that the swing bridge could suffice and the absence of evidence from the Coast Guard to the contrary.

Nor can Conrail show that Executive Order 11988 required it to change the bridge's design by relying on statements of experts like M&M. Most obviously, M&M and other experts are not the Coast Guard and lack the authority to make the assessments at issue. And to the extent Conrail relies on such expert opinions to suggest that it could not rebuild the swing bridge and had to change designs, those opinions are belied by the Coast Guard's actual communications as explained above. Moreover, M&M's expert opinions are improper legal opinions. *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (explaining that "an expert witness is prohibited from rendering a legal opinion"). M&M improperly rendered the legal opinion that rehabilitating the swing bridge would "not minimize floodplain impacts or protect the natural and beneficial values of the floodplain to the extent practicable," that the "[r]eplacement alternative was the only alternative to incorporate all measures practicable to minimize impacts to the floodplain," and that replacement "is the required alternative pursuant to Executive Order 11988." (Doc. No. 31-10 at 4, 7.) At bottom, expert opinions are just that—opinions. They do not carry the force of law and cannot assist the Court in interpreting the law or contract at issue.

Accordingly, the Court cannot conclude that Executive Order 11988 required Conrail to change the design of its bridge or build this particular lift bridge. Conrail is therefore not entitled

to coverage under the policies' "law and ordinance" provisions.  Without a basis to recover under the policies, summary judgment in favor of Defendants is proper.

**IV.     CONCLUSION**

For the foregoing reasons, Defendants' motion is **GRANTED**, and summary judgment is entered in their favor and against Conrail.  Conrail's motion for summary judgment is **DENIED**. An Order shall issue.


Dated: 6/10/2019                                              /s/ Robert B. Kugler
                                                             ROBERT B. KUGLER
                                                             United States District Judge